1
2
3
4
5
6
7
8

9          **UNITED STATES DISTRICT COURT**

10         **SOUTHERN DISTRICT OF CALIFORNIA**

11
12

13   E.DIGITAL CORPORATION,                     Case Nos.

14                              Plaintiff,      13-cv-2897-H-BGS
                  vs.                           13-cv-2899-H-BGS
15   NEW DANE, d/b/a DANE-ELEC;                 13-cv-2914-H-BGS
     GIGASTONE CORPORATION; and                 13-cv-2915-H-BGS
16   DANE ELEC CORP. USA, a/k/a                 13-cv-2946-H-BGS
     DANE CORP.;
17
                             Defendants.
18
                                                **CLAIM CONSTRUCTION**
19   E.DIGITAL CORPORATION,                      **ORDER**

20                              Plaintiff,
                  vs.
21   EYE-FI, INC.,

22                              Defendant.
23

24   E.DIGITAL CORPORATION,

25                              Plaintiff,
                  vs.
26   MUSHKIN, INC.,

27                              Defendant.
28

1

2   E.DIGITAL CORPORATION,

3                                    Plaintiff,

    vs.

4   OTHER WORLD COMPUTING,
    INC.,

5
                                    Defendant.

6   E.DIGITAL CORPORATION,

7                                    Plaintiff,

8   vs.

9   SEAGATE TECHNOLOGY LLC.,

10                                   Defendant.

11

12       On September 18, 2014, Plaintiff e.Digital Corp. and Defendants Dane Elec.

13   Corp. USA, Gigastone Corp., Eye-Fi, Inc., Mushkin, Inc., Other World Computing,

14   Inc., Seagate Technology, LLC and Swissbit NA, Inc., filed a joint hearing statement

15   in then-Lead Case No. 3:13-cv-2894-H-BGS, identifying twelve (12) disputed claim

16   terms plus the preamble from U.S. Patent No. 5,839,108 ("the '108 patent").[1]  (Doc.

17   Nos. 38-40.)  On October 30, 2014, the parties filed their opening claim construction

18   briefs.   (Doc Nos. 32 and 33 in new Lead Case No. 3:13-cv-2897-H-BGS.)   On

19   November 13, 2014, the parties filed responsive claim construction briefs. (Doc. Nos.

20   34 and 35.) The Court held a claim construction hearing on Friday, December 12, 2014

21   at 9:00 a.m.   Anton Handal and Gabriel Hedrick appeared for Plaintiff e.Digital.

22   Robert Ortiz appeared on behalf of defendants Mushkin, Inc. and Other World

23   Computing, Inc.[2]  D. Scott Hemingway was also present for the defendants.

24   _____

25       [1] Defendants subsequently withdrew their request for a construction of the term
    "non-volatile long term storage medium."
26
        [2] Multiple defendants have since filed notices of settlement.  At the time of the
27   claim construction hearing, only Defendants Mushkin, Inc. and Other World
    Computing, Inc. have not filed notices of settlement in this subset of the cases.
28

1    Upon review of the parties' claim construction briefs and accompanying

2    materials, the Court construes the disputed claim terms.

3    **Background**

4    This claim construction relates to Plaintiff's action against Defendants for

5    infringement of the '108 patent.  The '108 patent is a continuation-in-part of U.S.

6    Patent No. 5,787,445 ("the '445 patent").  Plaintiff asserts only claim 1 of the '108

7    patent against the Defendants.  With respect to the operative claim, the patent abstract

8    of the '108 patent describes "a flash memory module which can record data according

9    to industry standard formats to enable the transfer of data to and from personal

10    computers through swapping of flash memory media."  (See '108 patent, Abstract.)

11    **Discussion**

12  **I.**    **Legal Standards**

13      **A.**    **Legal Standards for Claim Construction**

14    Claim construction is an issue of law for the court to decide.  Markman v.

15  Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517

16  U.S. 370 (1996). "The purpose of claim construction is to 'determin[e] the meaning and

17  scope of the patent claims asserted to be infringed.'"  O2 Micro Int'l Ltd. v. Beyond

18  Innovation Tech. Co., 521 F.3d 1351, 1360 (Fed. Cir. 2008).  "It is a 'bedrock

19  principle' of patent law that the 'claims of a patent define the invention to which the

20  patentee is entitled the right to exclude.'"  Phillips v. AWH Corp., 415 F.3d 1303, 1312

21  (Fed. Cir. 2005) (en banc).

22    Claim terms are generally given their ordinary and customary meaning.

23  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  In patent

24  law, the ordinary and customary meaning of a claim term is the meaning that the term

25

26

27

28

would have to a person having ordinary skill in the art ("PHOSITA")[3] at the time of the invention.  Phillips, 415 F.3d at 1313.  In determining the meaning of a term, the PHOSITA is deemed "to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  Id.  This test provides an objective baseline from which to begin claim interpretation.  Id.

"In some cases, the ordinary meaning of claim language as understood by a [PHOSITA] may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."  Id. at 1314.  "However, in many cases, the meaning of a claim term as understood by persons of skill in the art is not readily apparent."  O2 Micro, 521 F.3d at 1360.  If the meaning of the term is not readily apparent, the court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including intrinsic and extrinsic evidence.  See Phillips, 415 F.3d at 1314.  A court should begin with the intrinsic record, which consists of the language of the claims, the patent specification, and, if in evidence, the prosecution history of the asserted patent.  Id.

In determining the proper construction of a claim, a court should first look to the language of the claims.  See Vitronics, 90 F.3d at 1582; see also Comark Commc'ns. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("The appropriate starting point . . . is always with the language of the asserted claim itself.")  The context in which a disputed term is used in the asserted claim may provide substantial guidance as to the meaning of the term.  See Phillips, 415 F.3d at 1314.  In addition, the context in which the disputed term is used in other claims, both asserted and unasserted, may provide

---

[3] Here, the parties agrees that a PHOSITA is "someone who has a bachelor's degree or equivalent academic or professional training in computer engineering, electrical engineering, computer science or a closely related field, plus two or three years of work experience in design or development of memory devices and/or systems."  (See Doc. No. 33 at 5:6-11; Doc. No. 34 at 1:11-13.)

guidance because "the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Id. A court must also read claims "in view of the specification, of which they are a part." Markman, 52 F.3d at 979; see 35 U.S.C. § 112(b) ("The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention.") The specification "is the single best guide to the meaning of a disputed term," and is usually dispositive of the term's meaning. Vitronics, 90 F.3d at 1582. In addition, "a claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support." Adams Respiratory Therapeutics, Inc. v. Perrigo Co., 616 F.3d 1283, 1290 (Fed. Cir. 2010) (citations omitted). But "[t]he written description part of the specification does not delimit the right to exclude. That is the function and purpose of claims." Markman, 52 F.3d at 980; Comark Commc'ns, 156 F.3d at 1186 ("[L]imitations from the specification are not to be read into the claims . . . .").

In construing the terms of a claim, even though claim terms are "understood in light of the specification, a claim construction must not import limitations from the specification into the claims." Deere & Co. v. Bush Hog, LLC, 703 F.3d 1349, 1354 (Fed. Cir. 2012). Moreover, "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." Liebel Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 906 (Fed. Cir. 2004).

A court may also look beyond the patent and consult the prosecution history during claim construction. Phillips, 415 F.3d at 1317. The prosecution history consists of the complete record of the proceedings before the PTO and the prior art cited during the examination of the patent. Id. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the

invention and whether the inventor limited the invention in the course of the prosecution, making the claim scope narrower than it would otherwise be." Id. Under the doctrine of prosecution disclaimer, "claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent." Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 33 (1966). But "in order for prosecution disclaimer to attach, the disavowal must be both clear and unmistakable." 3M Innovative Props. Co. v. Tredegar Corp., 725 F.3d 1315, 1325 (Fed. Cir. 2013). "[D]isavowal during prosecution overcomes the heavy presumption that claim terms carry their full ordinary and customary meaning." Biogen Idec, Inc. v. GlaxoSmithKline LLC, 713 F.3d 1090, 1095 (Fed. Cir. 2013). Because "the prosecution history represents an ongoing negotiation between the PTO and the inventor, 'it often lacks the clarity of the specification and thus is less useful for claim construction purposes.'" Id. (quoting Phillips, 415 F.3d at 1317).

In most situations, analysis of the intrinsic evidence will resolve claim construction disputes. See Vitronics, 90 F.3d at 1583. However, "because extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence." Phillips, 415 F.3d at 1319. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." Id. at 1317. A court evaluates all extrinsic evidence in light of the intrinsic evidence. Id. at 1319. A court should not rely on extrinsic evidence in construing claims to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. See Dow Chem. Co. v. Sumitomo Chem. Co., Ltd., 257 F.3d 1364, 1373 (Fed. Cir. 2001); Vitronics, 90 F.3d at 1583.

1    "[D]istrict courts are not . . . required to construe every limitation present in a

2    patent's asserted claims." <u>O2 Micro</u>, 521 F.3d at 1362.   In certain situations, it is

3    appropriate for a court to determine that a claim term needs no construction and its

4    plain and ordinary meaning applies.   See <u>id.</u>; <u>Phillips</u>, 415 F.3d at 1314.   But "[a]

5    determination that a claim term 'needs no construction' or has the 'plain and ordinary

6    meaning' may be inadequate when a term has more than one 'ordinary' meaning or

7    when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."

8    <u>O2 Micro</u>, 521 F.3d at 1361.   If the parties dispute the scope of a certain claim term,

9    it is the court's duty to resolve the dispute. <u>Id.</u> at 1362.

10           **B.     Legal Standards Regarding the Preamble**

11           "Whether to treat a preamble term as a claim limitation is determined on the facts

12    of each case in light of the claim as a whole and the invention described in the patent."

13    <u>Am. Med. Sys., Inc. v. Biolitec, Inc.</u>, 618 F.3d 1354, 1358 (Fed. Cir. 2010) (internal

14    quotations omitted).

15           In general, the preamble "does not limit the claims."   <u>Id.</u> (quoting <u>Allen</u>

16    <u>Engineering Corp. v. Bartell Industries, Inc.</u>, 299 F.3d 1336, 1346 (Fed. Cir. 2002)).

17    But a preamble "may be construed as limiting 'if it recites essential structure or steps,

18    or if it is necessary to give life, meaning, and vitality to the claim.'" <u>Id.</u> (quoting

19    <u>Symantec Corp. v. Computer Associates Int'l, Inc.</u>, 522 F.3d 1279, 1288-89 (Fed. Cir.

20    2008)).   "When limitations in the body of the claim rely upon and derive antecedent

21    basis from the preamble, then the preamble may act as a necessary component of the

22    claimed invention." <u>Eaton Corp. v. Rockwell Intern. Corp.</u>, 323 F.3d 1332, 1339 (Fed.

23    Cir. 2003).   "[C]lear reliance on the preamble during prosecution to distinguish the

24    claimed invention from the prior art transforms the preamble into a claim limitation

25    because such reliance indicates use of the preamble to define, in part, the claimed

26    invention." <u>Id.</u> (quoting <u>Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.</u>, 289 F.3d

27    801, 808 (Fed. Cir. 2002).   On the other hand, because a claim preamble typically

28

exists to "give context for what is being described in the body of the claim[,] if it is reasonably susceptible to being construed to be merely duplicative of the limitations in the body of the claim (and was not clearly added to overcome a rejection), [a court does] not construe it to be a separate limitation." Id. at 1288-89.  As a result, "[a] preamble is not limiting . . . where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." Symantec, 522 F.3d at 1288 (internal quotations omitted).

### C.   Legal Standards Regarding Indefiniteness and Incorporation by Reference

A patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention."   25 U.S.C. §112 ¶2 (2006 ed.).   "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2124 (2014).  "The definiteness requirement . . . mandates clarity, while recognizing that absolute precision is unattainable." Id. at 2129.  "[A] patent does not satisfy the definiteness requirement of § 112 merely because 'a court can ascribe some meaning to a patent's claims.'  The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1371 (Fed. Cir. 2014) (quoting Nautilus, 134 S. Ct. at 2130 & n.8).

To establish the meaning of a claim, a court can consider "[m]aterial not explicitly contained in the single, prior art document . . . if that material is incorporated by reference into the document." Adv. Display Sys., Inc. v. Kent State Univ., 212 F.3d 1272, 1282 (Fed. Cir. 2000).  "Incorporation by reference provides a method for integrating material from various documents into a host document [] by citing such

material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein.  To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents.  Whether material has been incorporated by reference into a host document, and the extent to which it has been incorporated, is a question of law." Zenon Envtl., Inc. v. U.S. Filter Corp., 506 F.3d 1370, 1378-79 (Fed. Cir. 2007) (internal quotations and citations omitted).  "In making that determination, the standard is whether one reasonably skilled in the art would understand the application as describing with sufficient particularity the material to be incorporated." Harari v. Lee, 656 F.3d 1331, 1334 (Fed. Cir. 2011).

## II.     Analysis of the Disputed Terms

### A.     The Preamble is Not Limiting

Defendants and Plaintiff disagree as to whether the preamble of claim 1 of the '108 patent is limiting.  Defendants argue that the preamble is limiting because the patentees of the parent '445 patent relied on the terms "file system," "primary memory," and the "direct manipulation … of data segments" from the preamble of that patent to distinguish prior art references cited by the examiner.  (Doc. No. 33 at 10:2-12:19.)  Plaintiff responds that Defendants misread the prosecution history of the '445 patent and that the limitations of claim 1 of the '108 patent constitute a self-contained description of the invention.  (Doc. No. 32 at 5:4-6:25; Doc. No. 34 at 6:17-8:9.)

The Court agrees with Plaintiff that the body of claim 1 defines the requisite components of the claimed invention and is thus a self-contained description of the invention.  See Symantec, 522 F.3d at 1288-1289.  Without the preamble, the invention remains functionally complete.  The preamble simply defines the intended use of the method that is described in the body of the claim.  Catalina Mktg., 289 F.3d at 808 ("a preamble is not limiting 'where a patentee defines a structurally complete invention in

the claim body and uses the preamble only to state a purpose or intended use for the invention'"). Accordingly, the preamble of Claim 1 is not limiting.

**B.   "file system"**

Defendants seek a construction of the term "file system," which is contained only in the preamble of claim 1. Defendants propose the term to mean "system to organize and keep track of files without using file allocation tables (memory maps)." (2894 Case, Doc. No. 39 at 20.)

The Court declines Defendants' proposed construction. In the '108 patent, the preamble is not limiting. See Symantec, 522 F.3d at 1288 ("A preamble is not limiting . . . where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.") (internal quotations omitted). Since the term "file system" is only contained within the preamble, the term therefore need not be construed.

**C.   "primary memory"**

Defendants propose that this term should be construed as "main memory of a computer system, i.e., the main general-purpose storage to which the microprocessor has direct access." (2894 Case, Doc. No. 39 at 3.) Plaintiff argues that Defendants are proposing the plain and ordinary meaning of the term primary memory whereas the invention discloses something different, namely a non-volatile primary memory composed of a plurality of blocks, which Plaintiff argues is distinct from the plain and ordinary meaning of "primary memory." (Doc. No. 32 at 10:27-13:17.) Plaintiff argues that, as a result, the term should be construed together with the entirety of the claim limitation "creating the primary memory from a non-volatile, long-term storage medium, wherein the primary memory comprises a plurality of blocks in which the data segments are to be stored." (Id.; see also 2894 Case, Doc. No. 39 at 3-4.)

The Court agrees with Plaintiff. The term "primary memory" should be construed in the context of the full claim limitation. The Court's construction for the

full claim term is explained below.  Primary memory at the time of the invention was commonly associated with RAM or "main memory," a form of volatile memory.[4]  (See Doc. No. 13:7-14:3.)  Claim 1 of the '108 patent discloses "creating the primary memory from a non-volatile, long-term storage medium, wherein the primary memory comprises a plurality of blocks in which the data segments are to be stored."  ('108 patent claim 1; see also Doc. No. 33 at 17:23-27 ("defendants propose replacing 'primary memory' with 'non-volatile, long-term memory,' because the claim itself states that primary memory is created from a 'non-volatile, long-term storage medium'").)  Yet, Defendants propose the plain and ordinary meaning of the term, which would include volatile "main memory" or RAM.  This is inconsistent with the disclosure of claim 1 of the '108 patent.  Accordingly, the term "primary memory" is therefore best understood in the context of the full claim limitation as construed by the Court.

**D.   "creating the primary memory from a non-volatile, long-term storage medium, wherein the primary memory comprises a plurality of blocks in which the data segments are to be stored";**

Plaintiff proposes that this phrase should be construed as "causing a portion or portions of a non-volatile long term storage medium, comprised of a plurality of blocks in which the data segments are to be stored, to perform at least one of a host's primary memory functions."  (2894 Case, Doc. No. 39 at 6.)  Defendants propose that the term should mean "dividing the non-volatile, long-term memory into equal size blocks, each block being the smallest amount of data that can be read from or written to the memory in a single read or write operation."  (Id.)

---

[4]Defendants further assert that the goal of the '108 patent is to replace all primary, main memory in the computer system.  (Doc. No. 35 at 3:19-4:1 and fn. 3.  This is not consistent with the intrinsic record.  First, the specification of the parent '445 patent states that the challenge resolved by the Norris Flash File System is to "reduce" RAM requirements.  ('445 patent at 3:22-28, 3:43-45; 3:47-49, 6:18-22, 8:27-32; 9:65-10:2; 14:29-35.)  The quotes offered by Defendants must be read in that context.  Defendants' position is further belied by the fact that dependent claim 14 of the '445 patent teaches using RAM as at least cache memory.  ('445 patent at claim 14.)

1   Plaintiff argues that this phrase conveys something other than the plain and

2   ordinary meaning of "primary memory," which it contends Defendants' construction

3   wrongly encompasses.  (Doc. No. 32 at 11:23-13:16.)  Specifically, Plaintiff argues

4   that the specifications of the '108 patent and parent '445 patent make clear that the

5   term calls for utilizing a block-oriented, non-volatile memory such as flash memory

6   to "accomplish typical file system functions as well as support features like editing

7   that are normally performed in RAM."  (Id. at 12:4-13:16, citing, *inter alia*, '445

8   patent at 9:65-10:2.)

9   Defendant asserts its proposed construction is rooted in the intrinsic evidence.

10  (Doc. No. 33 at 17:19-26, citing '108 patent, claim 1 and '445 patent at 4:19-23.)  It

11  further argues that creating a memory and causing portions of that memory to

12  perform functions (as Plaintiff proposes) are two different steps.  (Doc. No. 33 at

13  18:3-12; Doc. No. 35 at 6:10-24.)  Citing to other portions of the specifications,

14  Plaintiff disagrees, arguing that the two functions are the same under the patent.

15  (Doc. No. 34 at 14:17-15:5.)

16  The Court construes primary memory in the context of the full claim

17  limitation and adopts the plain and ordinary meaning of the phrase as "creating the

18  primary memory from a non-volatile, long-term storage medium wherein the

19  primary memory comprises a plurality of blocks in which data segments are stored,"

20  and declines to add additional terms from either party's proposed construction.  See

21  Vitronics, 90 F.3d at 1582.

22  **E.   "creating"**

23  Citing The Grosset Webster Dictionary (1970 ed.), Defendants argue that this

24  term should be construed as "making or producing."  (Doc. No. 33 at 17:28-18:2.)

25  Plaintiff argues that, like "primary memory," the term is best understood in the

26  context of the full claim limitation in which it is contained or, alternatively, that it

27  should be accorded its plain and ordinary meaning.  (Doc. No. 32 at 13:17-22.)  The

28

1    Court concludes that the term "creating" should be given its plain and ordinary

2    meaning.  See Vitronics, 90 F.3d at 1582.

3        **F.**    **"coupling a cache memory to the primary memory, said cache**
         **memory providing temporary and volatile storage for at least one**
4        **of the data segments"**

5            Plaintiff proposes that this term should be accorded its plain and ordinary

6    meaning.  Defendants argue that this phrase should be construed as "creating a

7    removable, interchangeable, electrical connection between the cache memory and the

8    primary memory." (2894 Case, Doc. No. 39 at 12.)  Defendants argue the '108 patent

9    asserts that "the flash memory used in the alleged invention is removable and

10   interchangeable." (Doc. No. 33 at 18:23-28, citing, e.g., '108 patent at 3:42-47, 5:14-

11   23, and 8:44-51; see also Doc. No. 35 at 7:1-21.)  Defendants also argue that U.S.

12   Patent No. 5,491,774 ("the '774 patent"), which is incorporated by reference by the

13   '108 patent, and its prosecution history describe flash memory as removable and

14   interchangeable.  (Doc. No. 33 at 19:1-7, citing '774 patent at 4:14-18, 4:59-63.)

15           The Court is not persuaded by Defendants' argument.  While unasserted

16   independent device claims 2 and 5 contain a "removable, interchangeable" limitation,

17   the method of claim 1 does not.  The Court will not import limitations into the claims

18   from the specification absent clear and unambiguous intent.  See Phillips, 415 F.3d at

19   1320.

20           Defendants also quote portions of the '108 patent specification.  However,

21   reading those excerpts in the full context of the specification, it is clear that the

22   removable, interchangeable flash memory disclosures are specifically directed at the

23   invention of claims 2 and 5, which are not asserted in this case.  (See, e.g., '108 patent

24   at claims 1 through 6; 3:44-63 (describing the separate handheld recording device of

25   claims 2 through 6, including microphones, input circuitry, amplification circuitry, and

26   other components which are disclosed in claims 2-6, but not claim 1); 5:14-18

27   (referencing the electrical coupling of the flash memory module with the memory

28

circuitry of the handheld recording device of claims 2 through 6).)

Moreover, the '774 patent is incorporated into the specification of the '108 patent only as an example of prior art. ('108 patent at 1:21-27.) The intrinsic evidence therefore does not demonstrate a clear and unambiguous intent to limit claim 1 to the disclosures of the '774 patent prior art.

The specification of the '445 patent states that Fig. 3A represents "[t]he apparatus of the present invention" of the '445 patent, from which claim 1 descends. ('445 patent at 8:1-9 and Fig. 3A.) Fig. 3A shows the cache memory coupled to an I/O, a processor, and flash memory.  (Id.)  Nothing suggests that the connection is removable or interchangeable.  Likewise, unlike the device claims 2 through 6, claim 1 of the '108 patent contains no "removable, interchangeable, flash memory recording medium" limitation.  (Compare '108 patent at claims 1 with claims 2-6.)  Viewing Fig. 3A of the parent '445 patent in conjunction with claim 1 of the '108 patent, a person of ordinary skill in the art would conclude that the cache memory could be a component of the separate host device or an included component contained within the removable flash memory module and that the connection therefore need not be removable or interchangeable.

As a result, the Court construes "coupling a cache memory to the primary memory, said cache memory providing temporary and volatile storage for at least one of the data segments" according to its plain and ordinary meaning.

G.     **"direct manipulation of contiguous and non-contiguous discrete data segments"**

Citing dictionary definitions of each of the key terms of this disputed phrase, Plaintiff argues that this phrase has a plain and ordinary meaning and need not be construed. (Doc. No. 32 at 16:26-17:3; 2894 Case, Doc. 39 at 17.)  Defendants on the other hand argue that the phrase should be construed as "manipulation of contiguous and noncontiguous data segments directly in the primary memory through changes to data segment headers without using a file allocation table." (2894 Case, Doc. 39 at 17)

1   Defendants' proposed construction essentially paraphrases the claim language with the

2   added limitations (1) "in the primary memory through changes to data segment

3   headers" and (2) "without using a file allocation table."  (See id.)

4       Defendants urge the Court to adopt its proposed construction in light of the

5   language of the specification of the parent '445 patent, which states in pertinent part:

6       These and other objects are realized in a method of memory management for a
        primary memory…, which enables direct manipulation of data stored therein.

7

8   (Doc. No. 33 at 16:24-26, citing '445 patent at 3:60-64 and 5:65-6:3, 6:45-50, 7:6-25.)

9   Defendants further point to a portion of the specification that states, "[a]ll

10  modifications take place as changes to data segment headers only."  (Doc. No. 33 at

11  16:26-17:1, citing '445 patent at 6:47-48.)  Defendants also incorporate their arguments

12  with respect to the alleged disavowal of file allocation tables and memory maps as

13  discussed with respect to the term "file system."  (Doc. No. 33 at 17:3-7.)

14      Plaintiff responds that Defendants are improperly importing limitations from the

15  specification of the parent patent.  (Doc. No. 32 at 17:16-21; Doc. No. 34 at 13:10-25.)

16  Plaintiff further argues that Defendants' proposed limitation regarding file allocation

17  tables and memory maps must fail for the same reason the similar proposed limitation

18  fails with respect to the term "file system."  (Doc. No. 32 at 17:8-15.)

19      The Court agrees with Plaintiff.  Claim 1 does not contain the limitations

20  proposed by Defendants.  See Vitronics, 90 F.3d at 1582; Comark Commc'ns, 156 F.3d

21  at 1186 ("The appropriate starting point . . . is always with the language of the asserted

22  claim itself.")  The dictionary definitions offered by Plaintiff demonstrate that the

23  disputed language would have had a plain and ordinary meaning to a PHOSITA at the

24  time of the invention.

25      The Court sees no reason why Defendants' proposed limitations should be

26  imported into the claim language.  Markman, 52 F.3d at 980; Deere & Co., 703 F.3d

27  at 1354; Comark Commc'ns, 156 F.3d at 1186 ("[L]imitations from the specification

28

- 15 -

are not to be read into the claims . . . ."); see also Phillips, 415 F.3d at 1323 ("persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments").  The language cited by Defendants does not amount to a clear disavowal of any method of modification aside from changes to data segment headers.  See Liebel Flarsheim Co., 358 F.3d at 909 ("absent a clear disclaimer of particular subject matter, the fact that the inventor may have anticipated that the invention would be used in a particular way does not mean that the scope of the invention is limited to that context") (internal quotation and citation omitted). Though the specification describes an embodiment in which "[a]ll modifications take place as changes to data segment headers only," the claim language, like the language of claim 1 of the '445 patent, is broader.  The patentees expressly state in the specifications of both the '108 patent and the parent '445 patent that the embodiments disclosed in the specification are only "illustrative" and "[n]umerous modifications and alternative arrangements may be devised by those skilled in the art."  ('445 patent at 23:34-40; see also id. at 4:40-44; '108 patent at 4:10-14, 10:57-63.)

Accordingly, the phrase "direct manipulation of contiguous and non-contiguous discrete data segments" has a plain and ordinary meaning and need not be construed.

**H.    "cache memory"**

Plaintiff asserts that the term "cache memory" has a plain and ordinary meaning. (Doc. No. 32 at 17:24-18:2, citing Plaintiff's Ex. E at 60 ("cache," "cache memory"); Ex. F at 68 ("cache").)  Defendants seek to construe the term as "memory strictly used to temporarily store a block of read/write data."   (Doc. No. 33 at 19:15-16.) Defendants point to a portion of the specification of the parent '445 patent, which states in pertinent part, "this invention strictly uses a cache memory…to temporarily store a block of read/write data." (Doc. No. 33 at 19:17-19, citing '445 patent at 8:25-26.)  Defendants further argue that, because the invention involves traversing the linked list of data segments, one segment at a time, the '445 patent must implement a

cache memory "only as large as a single read/write block of data." (Doc. No. 33 at 20:3-9.)

Plaintiff responds that Defendants' proposal to restrict cache memory solely to storing read/write data is not supported by the intrinsic record and that, while the record indicates that this is one function, the claim language does not suggest that it is the only function of the cache memory. (Doc. No. 32 at 18:2-18.) Plaintiff further responds that Defendants' proposed construction is unnecessarily restrictive and improperly imports limitations from the specification. (Id. at 18:19-19:5; Doc. No. 34 at 17:6-11.) Specifically, Plaintiff asserts that the specification discloses a cache memory "the size of at least one of the read/write blocks" to store "at least one of the data segments," but does not limit the size of the cache memory as Defendants propose. (Id. at 17:12-26, citing '108 patent at claim 1 and '445 patent at 4:23-26, 10:35-37.)

The record does not evidence a clear and unambiguous intent by the patentees to use cache memory "strictly" for storing a read/write block or to otherwise restrict the size of the cache memory. After reviewing the relevant record, the Court adopts the construction of "cache memory" as "memory used to temporarily store data."

## I.    "[previous] logical data segment"

Defendants contend that this term should include the term word "previous." (2897 Case, Doc. No. 33 at 20.) The Court agrees that the term was improperly truncated and considers the term "previous logical data segment."

Plaintiff asks that this term be construed as "logically related data segment." (2894 Case, Doc. No. 39 at 24-25.) Plaintiff argues that this construction is consistent with the intent of the inventors because the specifications of both the '445 patent and '108 patent "consistently refer to linking logically related data regardless of its physical location in flash memory." (Doc. No. 32 at 19:12-20:8, citing, *inter alia*, '108 patent at claim 1, 6:15-26, 6:30-36 and '445 patent at claim 1, Abstract, 3:47-49, 16:19-27, 17:27-42, 17:56-61, Figs. 5, 7A.)

Defendants seek to have the term construed as "data segment with a header that stores the physical location of the next logical data segment." Defendants cite to the same evidence relied on for their proposed construction of the term "direct manipulation of contiguous and non-contiguous discrete data segments." (Doc. No. 33 at 21:6-21.)

Plaintiff responds that Defendants are improperly importing limitations from the claims and that the patentees expressly stated in the specifications of the '108 patent and the '445 patent that the embodiments discussed therein are "illustrative" and that the claims are not limited to the discussed embodiments. (Doc. No. 34 at 17:3-23.)

The Court therefore concludes that the term "previous logical data segment" has a plain and ordinary meaning.

**J.** **"a logical link between the previous logical data segment and the new data segment"**

Plaintiff asserts that the phrase "a logical link between the previous logical data segment and the new data segment" has a plain and ordinary meaning. (Doc. No. 32 at 21:2-17, citing dictionary definitions at Plaintiff's Ex. E at 243 ("logical file") and Ex. F at 339 ("logical data design"), 340 ("logical format").)

Defendant asks the Court to construe the phrase as "a pointer written to the previous logical data segment that points to the physical location of the new data segment." (Doc. No. 33 at 21:23-25.) Defendants argue that the specification of the '445 patent only discloses a pointer as the mechanism for logically linking two data segments. (Doc. No. 33 at 22:2-26, citing '445 patent at 4:27-31, 6:3-8, 6:17-18, 17:49-51 and Defendants' Ex. 4 at 5.)

Plaintiff responds that the "logical link" need not be limited to a "pointer." (Doc. No. 32 at 21:2-19, citing Plaintiff's Ex. E at 243 ("logical file"), 277 ("offset") and Ex. F at 133 ("counter"), 339 ("logical data design"), 340 ("logical format").) According to Plaintiff, a logical link need only show a relationship between data and is not tied to any particular methodology. (Id.) Finally, Plaintiff also argues that the logical link

need not necessarily be "written to the *previous* logical data segment." (Doc. No. 32 at 21:20-22:9, emphasis in original.)   Plaintiff asserts that the use of the word "between" as opposed to the unidirectional language proposed by Defendants is consistent with the specification of the parent '445 patent, which discusses backward linking (for LIFO operations) and "tree" linking, which would require something other than simply a pointer from a previously written data segment to a new data segment. (Doc. No. 32 at 21:20-:22:1, citing, '445 Patent at Figs. 8 and 10, 5:14-16, 17:1-19:44.)

Defendant counters that the bulk of the definitions cited by Plaintiff relate to the larger concept logical files and not to the concept of linking itself. (Doc. No. 35 at 8:9-25.) Defendants also assert that the specification of the '445 patent does not disclose backward linking, but instead "discloses ways to use other data structures – such as a LIFO stack – to remember the path taken through the forward-linking pointers." (Id. at 8:26-9:3.)

Claim 1 does not contain the limitation proposed by Defendants. See Vitronics, 90 F.3d at 1582; Comark Commc'ns., 156 F.3d at 1186. The Court concludes that the term "a logical link between the previous logical data segment and the new data segment" should be given its plain and ordinary meaning.

### K.   "a path for sequentially accessing the data segments within the primary memory"

Plaintiff proposes the plain and ordinary meaning for the construction of this disputed phrase. (2894 Case, Doc. No. 39 at 29-30.)   Defendants seek to have the Court construe the phrase as "a linked list used instead of a file allocation table (memory map) for sequentially accessing data segments within the primary memory." (Id.)

In support, Defendants rely on portions of the parent '445 patent specification that discuss reducing RAM requirements by "replacing a memory map with logically linked serial data segments" and using "absolute physical memory addresses to avoid the additional overhead created by memory mapping." (Doc. No. 33 at 15:6-10, *citing*

'445 patent at 3:47-49, 3:57-59.)   Defendants further point to portions of the specification and prosecution history of the parent '445 patent in which the inventors sought to distinguish their invention from a type of memory mapping taught by U.S. Patent No. 5,404,485 issued to Ban ("Ban"), U.S. Patent No. 5,586,291 issued to Lasker ("Lasker"), and Jeffrey, *et al.*, "Data structures," Prentice-Hall, Inc., pp. 54-65, 184-191 (hereinafter, "Jeffrey").   (Doc. No. 33 at 15:12-16:16, citing in part '445 patent at 7:20-25, 51-55, 62, 65; '108 patent at 1:55-2:32; and Defendants' Ex. 4 at 5-8.)[5]

Plaintiff argues that Defendants' attempt to add the limitation regarding file allocation tables is based on an unduly broad reading of the file history of the '445 patent.   (Doc. No. 32 at 7:21-9:15.) Specifically, Plaintiff asserts that the file history does not contain a clear and unambiguous wholesale disclaimer of the use of file allocation tables or memory maps, but instead distinguishes a specific functionality of particular types of file allocation tables described in the prior art.  (Id. at 8:17-9:15.) See 3M Innovative Props., 725 F.3d at 1325.

Plaintiff further points out that the specification of the parent '445 patent discloses a memory map and other directories as components of a preferred embodiment and further discloses compatibility with DOS-based systems which Plaintiff argues typically utilize FAT-based file systems.  (Id. at 8:5-16, citing '445 patent at Figs. 5 and 6, 5:4-6, 8:38-46 ("there is a physical memory structure, memory block mapping, and a file system logical overlay of the physical memory structure"), 10:45-67 ("The memory block map indicates good erase blocks 42 and bad erase blocks 68… As part of memory block mapping, a logical block control map 74 contains within it the beginning physical address of each block 76, the physical address of the

---

[5] Defendants initially made these arguments with respect to construing the term "file system." (2897 Doc. No. 33 at 14-16.) The Court does not construe the term file system. The Court considers these arguments in construing this term.  (See id. at 23-24, referencing the previous disclaimer arguments.)

beginning of the next available memory space within the logical block 78, and a map of bad blocks 80 within the logical block 60 to which data should not be written"); 8:46-49 (stating that file system "is compatible with DOS found on many Intel microprocessor-based personal computers today"); 10:6-12, 10:45-67, 12:23-47 ("The Volume Header information pertains principally to the logical mapping memory structure shown in FIG. 5…Formatting provides the logical structure overlay which a file system uses to determine the logical and corresponding physical location of data stored therein.  Therefore an element of the Volume Header is the expected DOS volume name"), 20:33-22: (referencing DOS-style root directory, "index of segments," "presentation map" and other tables that could be considered "memory maps").) Accordingly, Plaintiff argues, claim 1 of the '108 patent contemplates the use of memory maps and compatibility with FAT-based systems and does not preclude the use of file allocation tables and memory maps.

Defendant responds that e.Digital ignores instances in which the patentee of the '445 patent distinguished the use of memory maps more broadly by stating, for example, "no FAT is used." (Doc. No. 35 at 4:17-5:2.)  Defendants also argue that limitations may be construed to exclude embodiments, presumably referring to the specification's disclosure of memory maps, if the prosecution history compels it. (Id. at 5:15-20.)  Defendant further argues that the invention's compatibility with DOS is irrelevant because the DOS file system has many features in addition to file allocation tables. (Id. at 5:15-23.)  Accordingly, Defendants argue, a file system could be compatible with features of DOS even if FAT is disclaimed. (Id. at 5:23-24.)

Neither the claims nor the intrinsic evidence clearly and unmistakably disavow the use of file allocation tables and/or memory maps. See 3M Innovative Props., 725 F.3d at 1325.  The '445 patent specification, as Plaintiff points out, discloses the use of a memory block map as part of an embodiment of the invention.  (See '445 patent at Figs. 5 and 6, 8:38-46, and 10:45-67.)  In addition, the '445 specification discusses

an embodiment using, among other things, "root directories," an "index of segments," and a "presentation map," which might be considered by a person of ordinary skill in the art to be analogous to a file allocation table or memory map. (See '445 patent at 20:33-22:14 (referencing, *inter alia*, use of root directory, "nfsMkDir" and "nfsChDir" described as "Norris File System Directories," "index of segments," and "presentation map").)  Any construction of this term therefore cannot exclude memory maps.  See Adams Therapeutics, Inc., 616 F.3d at 1290 ("a claim construction that excludes the preferred embodiment is rarely, if ever, correct").

The prosecution history does not compel excluding this embodiment as Defendants suggest.  Though the specification and file history of the parent '445 patent discuss reducing RAM overhead by using logical linking of data segments, the only particular feature of memory mapping specifically distinguished by the patentee is the feature of the Jeffrey, Lasker and Ban prior art.  In that prior art, each time a file is to be modified, the file data must be retrieved from flash memory, placed into a volatile RAM cache, manipulated in RAM, and the entire file resaved to flash memory in a new and unused contiguous memory segment.  (See '445 File History, November 10, 1997 Amendment at 7 ("Ban retrieves an entire file which is to be modified into volatile RAM cache memory, manipulates the data …, then resaves the entire file to main memory in a new and unused contiguous memory segment"); see also id. ("It should be apparent from the description of Ban in the patent application that it uses flash memory just as the combination of Lasker and Jeffrey would try to use it."); see also id. at 6 (referring to the invention of the '445 patent: "instead of reading a FAT into cache memory, erasing the FAT form primary memory, modifying the FAT in cache memory, and then resaving it to primary memory each time that any data is added to or deleted from primary memory (as Ban does), no FAT is used, and data is manipulated directly in primary memory") (emphasis in original).)  Although other portions of the specification refer to FAT generally, as this is the only specific feature

of FAT discussed and distinguished by the inventors and given the references in the '445 patent specification to embodiments utilizing a memory block map, root directory, the "Norris File System Directories," "index of segments," and "presentation map," the '445 patent's distinction of certain prior art memory mapping technologies does not amount to a "clear and unmistakable" disavowal of memory mapping or file allocation tables in any form. See 3M Innovative Props., 725 F.3d at 1325; Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1325 (Fed. Cir. 2003).

    Accordingly, the Court will accord this term its plain and ordinary meaning without the additional limitations proposed by Defendants.

**L.   "[industry standard] data storage format"**

    Plaintiff proposes that the term "data storage format" should be construed as "file system." (2894 Case, Doc. No. 39 at 34.) Defendants also seek to have the Court add the term "industry standard" to the proposed construction, which term Plaintiff argues has a plain and ordinary meaning. (Id. at 32, 34-35.) Plaintiff argues that the specifications of both the '108 patent and the parent '445 patent support a finding that the term "data storage format" means "file systems," which Plaintiff argues, is used interchangeably throughout the patents with the term "operating system." (Doc. No. 32 at 23:12-24:27.) Plaintiff points out that the invention of the '445 patent is referred to in both patents as the "Norris Flash File System" and cites excerpts from the specifications of both patents referring to the compatibility of the Norris Flash File System with other operating systems and "memory schemes" such as DOS and IDE hard drive memory card interfaces. (Id. at 23:12-25:6, citing '445 patent at 8:38-60 and '108 patent at Abstract, 1:64-67, 3:19-22, and 8:44-65.)   Plaintiff also points to a portion of the specification that states, "[a]nother object is to enable the flash memory to store data so as to appear readable to industry standard information storage and retrieval operating interfaces and operating systems." (Doc. No. 32 at 24:5-8, citing ('108 patent) at 3:19-22.)   Accordingly, Plaintiff argues, the industry standard data

storage format can be a file system or operating system such as that used in DOS. (Doc. No. 32 at 24:10-11, 25:2-6.)

Defendants request that "industry standard data storage format" be construed as "format in which data is stored that conforms to an industry standard." (2894 Case, Doc. No. 39 at 32.) Defendants argue that this construction is consistent with the plain and ordinary meaning of the term and with the specification of the '108 patent. (Doc. No. 33 at 24:17-19.) Defendants cite to some of the same intrinsic evidence relied upon by Plaintiff (e.g., '108 patent at Abstract, 3:19-21), but also refer to a portion of the '108 patent specification referring to MPEG-2 as an "industry standard." (Doc. No. 33 at 24:24-28.) Defendants further argue that Plaintiff's proposed construction improperly equates file systems with data storage formats and conflicts with the '445 patentee's distinction between "data structures" and "file structures." (Doc. No. 35 at 9:27-10:13.)

Plaintiff responds that Defendants' proposed construction unduly encompasses file types such as, e.g., MPEG-2, jpeg, and mp3, which Plaintiff argues is not what the patentees intended the term to mean. (Doc. No. 34 ("Responsive Brief") at 20:16-22.) Plaintiff further points out that the excerpt cited by Defendants with respect to MPEG-2 refers to MPEG-2 as a "compression algorithm" rather than a data storage format. (Id. at 20:18-22.) Finally, Plaintiff asserts that the patentees' discussion of the MPEG-2 algorithm is contained within a portion of the specification discussing embodiments of the device claims 2 through 6 rather than the method claim 1. (Id. at 20:23-27, citing '108 patent at 9:48-10:56.)

After reviewing the record, the Court determines that the term "industry standard" has a plain and ordinary meaning. See Vitronics, 90 F.3d at 1582. The Court further construes "data storage format" to mean "file storage for data."

/ / /

/ / /

1    **III.   Indefiniteness**

2        Plaintiff concedes that, if any portion of claim 1 of the '108 patent is indefinite,

3    such finding would be case-dispositive.  (2894 Case, Doc. No. 38 at p. 2, fn. 1.)

4        Relying on <u>Zenon Envtl., Inc. v. U.S. Filter Corp.</u>, <u>supra</u>, Defendants argue that

5    certain terms of claim 1 are indefinite because the disclosures of the '445 patent were

6    not properly incorporated by reference into the specification of the '108 patent and, as

7    a result, claim 1 is indefinite to the extent it depends on any written description

8    contained in the '445 patent specification.  (Doc. No. 33 at 5:12-7:5; Doc. No. 35 at

9    1:17-.)  Specifically, Defendants argue that the following terms are indefinite on the

10   basis of the patentees' alleged failure to properly incorporate the disclosures of the

11   '445 patent by reference: (1) "creating the primary memory from a non-volatile, long

12   term storage medium, wherein the primary memory comprises a plurality of blocks in

13   which the data segments are to be stored;" (2) "direct manipulation of contiguous and

14   non-contiguous data segments;" (3) "file system;" (4) "cache memory;" (5) "a logical

15   link between the previous logical data segment and the new data segment;" (6)

16   "previous logical data segment;" and (7) "a path for sequentially accessing the data

17   segments within the primary memory."  (<u>Id.</u> at 7:18-28.)

18       Plaintiff, on the other hand, argues that Defendant has conceded that the

19   specification of a parent patent may be considered in construing the terms of a

20   continuation patent.  (Doc. No. 34 at 20-23, citing Doc. No. 33 at 8:7-14 and <u>Omega</u>

21   <u>Eng'g</u>, 334 F.3d at 1333.)  Plaintiff further argues that <u>Zenon Environmental</u> is

22   inapposite because, it argues, that case concerned the issue of what priority date the

23   patent-in-suit was entitled to and did not concern issues of claim construction and

24   indefiniteness.  (Doc. No. 34 at 2:2-4:7.)  In addition, Plaintiff argues, the patentees

25   complied with the reference requirements of 35 U.S.C. § 120 and related regulations,

26   including, e.g., 37 CFR 1.78(c) and Manual of Patent Examining Procedure ("MPEP")

27   211.01(b).  (Doc. No. 34 at 4:10-19.)  Finally, Plaintiff argues that claim 1 of the '108

28

patent and claim 1 of the '445 patent are identical except that the '108 patent adds one more limitation, which limitation Defendants do not claim is indefinite.  (Doc. No. 34 at 4:23-5:3.)  On the basis of all of the above, Plaintiff asserts that a person of ordinary skill in the art would naturally look to the parent patent for further disclosures of the patent claims of the continuation.  (Id. at 5:3-7.)

Defendants' arguments are unpersuasive.  First, even if Defendants were correct that the patentees failed to sufficiently incorporate the disclosures of the '445 patent, reference to the '445 patent is unnecessary to understand the scope of the claims as most of them have a plain and ordinary meaning or have meanings that are otherwise readily apparent.  See Vitronics, 90 F.3d at 1582.

Second, the Court agrees with Plaintiff that Defendants' reliance on Zenon is misplaced.  Defendants attempt to draw a line between Zenon, which involved a determination that a continuation patent was not entitled to the priority date of an earlier-filed parent patent, and indefiniteness.  These are distinct issues.  Zenon was solely concerned with whether an intervening continuation patent "broke the chain" of continuity between a parent patent and the asserted continuation patent so that the defendants could rely on the parent patent as prior art.  In the context of claim construction, because a parent patent constitutes intrinsic evidence upon which a Court can rely to construe the claims of a later continuation patent, whether the '108 patent is entitled to the priority date of the '445 patent is irrelevant.  See Omega Eng'g, 334 F.3d at 1333.  The '445 patent is not "extrinsic material" as characterized by Defendants.  (See Doc. No. 35 at 1:20-21.)

Here, the '108 patent clearly states that it is a continuation-in-part of the '445 patent, which the '108 patent specification describes as "an operating system including improved file management for use in devices utilizing flash memory as main memory." (See '108 patent at face page and 1:5-9.)  The '445 patent file history constitutes intrinsic evidence that the Court may use to construe the claims of the '108 patent, even

if not expressly incorporated by reference.   <u>Omega Eng'g</u>, 334 F.3d at 1333. Accordingly, the claim terms "creating the primary memory from a non-volatile, long term storage medium, wherein the primary memory comprises a plurality of blocks in which the data segments are to be stored;" "direct manipulation of contiguous and non-contiguous data segments;" "file system;" "cache memory;" "a logical link between the previous logical data segment and the new data segment;" "previous logical data segment;" and "a path for sequentially accessing the data segments within the primary memory" are not indefinite.

## **Conclusion**

After considering the record and reviewing each party's constructions in light of the applicable standards of law, the Court issues this claim construction.

**IT IS SO ORDERED.**

DATED: December 12, 2014

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT

13cv2897; 13cv2899;
13cv2914; 13cv2915; 13cv2946